1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ILLINOIS
2                      EAST ST. LOUIS DIVISION

3

GREGG L. DUCKWORTH,                    )
4                                      )
        Plaintiff,                     )
5                                      )
        -vs-                           )    No.
6                                      )    3:02-CV-00381-JLF
DAVID J. MADIGAN, MAHER                )
7    AHMAD, M.D., and FRANCIS          )
KAYIRA, M.D.,                          )
8                                      )    **ORIGINAL**
        Defendants.                    )
9

10

11

12

13              THE DEPOSITION of MAHER AHMAD, M.D.,
     the defendant herein, called by the Plaintiff for
14   examination pursuant to notice and pursuant to the
     provisions of the Code of Civil Procedure and the
15   Rules of the Supreme Court thereof pertaining to
     the taking of depositions, taken before me, Jill A.
16   Bleskey, CSR-RPR, License No. 084-004430, a Notary
     Public in and for the State of Illinois, at
17   Frederick & Hagle, 129 West Main Street, in the
     City of Urbana, County of Champaign, and State of
18   Illinois on the 5th day of October, A.D., 2006,
     commencing at 1:30 p.m.

19

20   ------------------------------------------------

21

                        Jill A. Bleskey, RPR
22                         CSR #084-004430

23

EXHIBIT
4

```
 1              Q.      To your knowledge, did Wexford have

 2      an agreement with Champaign County?

 3              A.      I believe they did, yes.

 4              Q.      And what is your understanding of the

 5      terms of that agreement between Wexford and

 6      Champaign County?

 7              A.      I wouldn't know.  I didn't -- I

 8      didn't look at it.  I wasn't part of it.

 9              Q.      Whether it was part of the agreement

10      or not, has it ever been your understanding that

11      Wexford agreed to provide medical care to the

12      inmates of the Champaign County Jail?

13              A.      Yes.       .

14              Q.      Okay.  Have you personally ever

15      entered into any agreements with Wexford?

16              A.      I had a -- I was an independent

17      contractor for Wexford, I was not an employee of

18      them.

19                      MR. HAGLE:  That's at the time of any

20      involvement with Mr. Duckworth, correct?

21                      THE WITNESS:  That's correct.

22                      BY:  MR. KILPATRICK

23              Q.      You mentioned the term independent
```

just to avoid any confusion, I'm interested only in

your time as the medical director of the Champaign

County Jail, while you worked in that capacity as

the medical director.  In a typical week how many

hours would you spend performing your duties as

medical director?

     **A.**     Actually the agreement was for a

maximum of eight hours per week.

     Q.     Did that include both the screening

physicals portion of your duties and the sick call

portion of your duties?

     **A.**     Yes.

     Q.     Did Wexford ever provide you a

written job description for your duties as medical

director?

     **A.**     Not to my recollection.

     Q.     How did -- how did you come to have

the title listed in Exhibit 1 of medical director?

     **A.**     That's what they called their medical

doctor over there.

     Q.     And was that referred to by people

from the Champaign County Jail as well as people

from Wexford?

1   had while you were present as the medical director

2   of the jail?

3       A.      Similar.  To be honest with you, I'm

4   not sure if she was involved with screening of the

5   sick calls, I think that was mainly the nurse who

6   did that in both facilities.  But again, she

7   assisted me on, you know, sick calls and screening

8   calls.

9       Q.      Let me ask you a few questions about

10  the sick call process.  What is your understanding

11  of how an inmate would go about getting a visit

12  with you as the medical director?

13      A.      Basically what I know is that they

14  submit a request.  And I believe it was even -- I

15  think it was a yellow form, if I remember

16  correctly.  And they get screened by the nurse and

17  then the nurse would call me and say I have five

18  patients for you to see or two or whatever and I'd

19  tell them I'll be in at six o'clock or, you know,

20  and then she'd have the patients ready.

21      Q.      Would you be provided a copy of this

22  yellow request form that you mentioned?

23      A.      When the inmate is -- comes in to be

1   seen, yes, that yellow form is available.

2        Q.      Would the nurse or the LPN typically

3   be the person that would hand you that complaint

4   form?

5        A.      Yes.   I think, if I remember

6   correctly, usually they get stapled along with my

7   progress note sheets.

8               MR. HAGLE:   For the record, you said

9   complaint form, you meant the request form?

10              MR. KILPATRICK:   I apologize, I did

11  mean the request form.

12              THE WITNESS:   Right.

13              BY:  MR. KILPATRICK

14       Q.      Is your answer the same?

15       A.      Yes.

16              MR. HAGLE:   Because there are also

17  grievance forms which is completely different.

18              MR. KILPATRICK:   I understand.

19              BY:  MR. KILPATRICK

20       Q.      I'm referring only to an inmate's

21  request to receive medical treatment.

22       A.      Correct.

23       Q.      Okay.  While you were the medical

1    director at the jail, if an inmate had a request to

2    speak to a doctor, would you have been the doctor

3    that he would have been directed to see?

4         A.    Yes.

5         Q.    Okay.  To the best of your knowledge,

6    were there any other doctors that would provide

7    treatment to inmates during the time that you were

8    medical director at the Champaign County Jail?

9         A.    Within the facility, within both

10   facilities?

11        Q.    Yes.  Within the facility, would any

12   other doctors provide treatment to the inmates?

13        A.    No.

14        Q.    And as part of your responsibility as

15   being the medical director, would you sometimes

16   have occasion to refer an inmate to an outside

17   facility for treatment?

18        A.    Yes.

19        Q.    Okay.  Would that sometimes be in the

20   form of testing?

21        A.    Yes.

22        Q.    Okay.  And I presume there would be

23   some types of medical treatment that you simply

1    was an employee of Champaign County?

2        **A.**      No, I don't.

3        Q.      Did any of the medical staff at the

4    Champaign County Jail, other than you, have

5    authority to refer an inmate to an outside facility

6    or doctor?

7        **A.**      Quite honestly, I wouldn't know.

8        Q.      Do you have any reason to think that

9    there might be someone that would have that

10   authority to refer an inmate outside to another

11   doctor?

12           **MR. HAGLE:**  Well, I'm going to

13   object, argumentative.  He just said he didn't

14   know.  Go ahead and answer.

15           **THE WITNESS:**  Usually what happened

16   if somebody needed to be referred the nurse would

17   discuss that with me, that was the usual line of

18   action.  But whether or not they had the authority

19   to do that or not, I mean, to refer independently,

20   I couldn't answer that.

21           **BY:  MR. KILPATRICK**

22       Q.      Do you recall any times, while you

23   were the medical director at the jail, where an

1       inmate would have been referred to an outside

2       facility that you did not authorize?

3               **A.**       No.

4               Q.       Did any of the medical staff at the

5       jail, during the time that you were the medical

6       director, have authority to write prescriptions for

7       medication for the inmates?

8               **A.**       There were some medications that were

9       available in the commissary and those did not need

10      a doctor's approval.

11              Q.       Can you tell me the names of those

12      medications, if you remember?

13              **A.**   .   It was simply pain medications,

14      Ibuprofen, Tylenol.

15              Q.       Would it be fair to say that those

16      medications would all be over-the-counter

17      medications that could all be purchased without a

18      prescription?

19              **A.**       Correct.

20              Q.       Okay.  Of the time that you would

21      spend in a typical week at the Champaign County

22      Jail, how much time would you spend in the old

23      building versus the new building?

51

```
 1     symptom?

 2          A.      It could be indicative of some kidney

 3     disease, some nephritis.  It could be indicative of

 4     kidney stones, it could be indicative of cancer,

 5     some diseases of the urinary system.

 6          Q.      Is it correct to say that gross

 7     hematuria is often considered an indicating symptom

 8     of some of those same symptoms that you just listed

 9     for me?

10          A.      It's one of the signs.  Of course I

11     forgot to mention also trauma.

12          Q.      And hematuria or gross hematuria can

13     be an indicating symptom for a variety of cancers

14     throughout the urinary system; --

15          A.      That's correct.

16          Q.      -- is that correct?

17          A.      That's correct.

18          Q.      And that would include bladder

19     cancers?

20          A.      That's correct.

21          Q.      That would include invasive or

22     malignant cancers as well?

23          A.      Correct.
```

1    allergies, patient is allergic to penicillin.

2    Physical exam -- PE, physical exam, not in

3    distress.  Abdomen, soft, no tenderness.  Renal

4    angles free, in other words free of tenderness.

5    Penis was examined.  One sonometer pea sized lump,

6    open parentheses, hard texture, closed parentheses,

7    left aspect, mid-shaft, no discharge, meaning no

8    discharge from the penis, and no warty lesions.

9         Q.    And if you could continue by just

10   reading that last section underneath special

11   instructions.

12        A.    A/P, assessment and plan.  Number 1,

13   painless hematuria; Number 2, questionable penile

14   mass.  And the plan was urology referral.

15        Q.    Do you have a recollection, as you

16   sit here today, of seeing Mr. Duckworth on or about

17   August 24th of 1999 that led you to prepare this

18   report?

19        A.    Yes.

20        Q.    Is it your understanding that Mr.

21   Duckworth orally explained to you that he was

22   seeing blood in his urine at the time of your first

23   meeting?

65

1          A.      Yes.

2          Q.      Okay.  The reference at the bottom of

3    the page -- or the statement at the bottom of the

4    page, urology referral, was that a notation to you

5    of a type of treatment that you would prescribe for

6    Mr. Duckworth in the future?

7          A.      No.  This was an order, urology

8    referral.  So patient needs to be referred to

9    urology.  This was the plan.  Assessment, as

10   mentioned -- AP, assessment and plan.  So the plan

11   was urology referral.

12         Q.      To whom or to where did you refer Mr.

13   Duckworth as part of this order that's dated August

14   24th?

15         A.      To the urology department.  And the

16   people who take care of that would be the nurse and

17   the facility.  I did not overlook their referral

18   process.

19         Q.      You mention the term urology

20   department.  What department or where are you

21   referring to that, is that at a hospital?

22         A.      No.  It's usually a clinic.

23         Q.      At a clinic?

1      **A.**     Correct.

2      Q.     And you did not write the word done

3  on the line below that?

4      **A.**     No, I didn't.

5      Q.     Okay.  So let's move up back to the

6  analysis section.  Remind me again what that line

7  means, the R/O?

8      **A.**     Rule out urinary tract infection.

9      Q.     Okay.

10     **A.**     R/O is short for rule out.

11     Q.     Okay, I understand.  As of the date

12  of Exhibit 8 here, had you made a diagnosis as to

13  the cause of Greg Duckworth's hematuria that you

14  had previously seen?

15     **A.**     No, I haven't.

16     Q.     Okay.  On the line that begins the

17  capital letter A on Exhibit 8, what were the facts

18  that led you to rule out urinary tract infection as

19  stated in Exhibit 8?

20     **A.**     It was something -- I wanted to rule

21  out urinary infection, there was no specific facts.

22     Q.     How did it come about that you ruled

23  out urinary tract infection?

1          **A.**      I didn't rule it out, I wanted to

2     rule it out.

3          Q.       So this is a statement of intent?

4          **A.**      To rule out, yes.  Yes.  To rule out.

5          Q.       In other words, I must rule out in

6     the future?

7          **A.**      Correct.

8          Q.       So you had not done that --

9          **A.**      No, no.

10         Q.       -- at that point?

11         **A.**      Correct.

12         Q.       And do you -- do your symbols on the

13    line beginning with P that says check urinalysis,

14    what does that indicate to you?

15         **A.**      It's to obtain urinalysis.

16         Q.       Okay.  Do you know whether -- as of

17    the date of this Exhibit 8 whether you had reviewed

18    any of Greg Duckworth's urinalysis forms?

19         **A.**      No.

20         Q.       Okay.  I'll ask you to set that

21    aside.  I'm going to hand you what has been marked

22    as Exhibit 9.  Please take a chance to look over

23    it.  And for the record, I'll read that the printed

1    date at the top left-hand corner of the form is

2    October 9th, 1999.  And Dr. Ahmad, to save some

3    time on questions that I had previously asked, do

4    you see Mr. Duckworth's name appearing in the upper

5    shaded area --

6        **A.**     Yes.

7        Q.     -- of the left-hand part?  And again,

8    your name does appear as the submitting doctor in

9    the non-shaded portion of the form?

10       **A.**     Yes.

11       Q.     Okay.  Do you recall receiving this

12   urinalysis report that's contained in Exhibit 9?

13       **A.**     No.

14       Q.     Okay.  Do you recall ordering this

15   urinalysis report for Mr. Duckworth?

16       **A.**     Yes.

17       Q.     Okay.  Were you informed of the

18   results of this urinalysis test contained in

19   Exhibit 9?

20       **A.**     I believe I have been.

21       Q.     How was it that you were informed of

22   the results of this test?

23       **A.**     Usually if I requested a test, unless

1    I've actually reviewed the test, sometimes I get a

2    phone call from the staff saying -- informing me of

3    the results.

4        Q.    And that staff would have been the

5    staff at what location?

6        A.    At the jail.

7        Q.    At the jail?

8        A.    Correct.

9        Q.    I'm going to ask you to look at a

10   particular part of this form.  Do you see the line

11   that reads urine blood?

12       A.    Yes.

13       Q.    To the right of that is the number 25

14   contained in a box; is that correct?

15       A.    That's correct.

16       Q.    And to the right of that is the

17   letter H, do you see that?

18       A.    Correct.

19       Q.    All right.  I'm going to ask you a

20   couple questions about that.  First, what does the

21   category urine blood represent to you?

22       A.    It indicates the microscopic

23   hematuria or presence of blood in the urine.

1    asked.

2          A.        As far as no treatment has been

3    prescribed, yes.  Up until then no treatment has

4    been prescribed.

5          Q.        Okay.  Do you recognize the

6    handwriting on that portion that I asked you to

7    read aloud here on Exhibit 16?

8          A.        Well, I recognize the signature, I

9    could read the signature who was Lu Wilson who was

10   the RN.

11         Q.        Okay.  And you can set that aside for

12   me, thank you.  I'm going to hand you now what has

13   been marked as Exhibit 17.  And again, for the

14   record, this exhibit is dated in the upper

15   left-hand corner February 16, 2000.  Do you -- Dr.

16   Ahmad, do you recognize the signature or mark that

17   appears at the bottom of this page to be your

18   signature?

19         A.        Yes, I do.

20         Q.        And again, that indicates to you that

21   you have reviewed this -- at one time you received

22   and reviewed this report?

23         A.        Correct.

1      **A.**      Correct.

2      Q.      Okay.  You can set that aside.  I'll

3   hand you now what has been marked as Exhibit 22.

4   And while you're looking over that I'll state that

5   this exhibit contains the handwritten date of March

6   14th, 2000.  Dr. Ahmad, again, this is one of the

7   doctor's orders sheets similar to the types of

8   sheets we've looked at earlier, correct?

9      **A.**      Correct.

10      Q.      And do you recognize the handwriting

11   in the blanks following the letters S, O, A, P to

12   be your handwriting?

13      **A.**      Correct.

14      Q.      And do you recognize the signatures

15   on the line for physician to be your signature?

16      **A.**      Yes.

17      Q.      Okay.  As you've done before, will

18   you please read for me the handwritten portions on

19   the blanks beginning with the letters A and P?

20      **A.**      No significant change in urine, mild

21   increase in urine blood, no indication for further

22   follow-up.

23      Q.      Starting at the bottom, what does the

1    statement "no indication for further follow-up"

2    mean to you?

3         A.      Means no further follow-up as far as

4    the urine blood and change in the urinalysis is

5    concerned.

6         Q.      As of the date of this Exhibit 22,

7    was Mr. Duckworth still presenting with hematuria?

8         A.      Yes.

9         Q.      And that hadn't -- the presence of

10   hematuria in his blood, according to your notes

11   here in Exhibit 22, had not changed?

12        A.      Yes, he had urine in the blood.

13        Q.      And can you tell me the reason for

14   not prescribing a further follow-up treatment for

15   Mr. Duckworth's hematuria?

16        A.      Well, in the previous assessment and

17   the previous visits I requested review of the old

18   records of the patient.  Up until this point I was

19   under the impression that the patient is being

20   followed by urology and on a future visit I

21   realized that patient is -- on a future --  as

22   indicated by future records I realized that the

23   patient has not actually seen urology and has not

1    actually been evaluated by urology so I took

2    different actions.

3         Q.      What do the marks in the bottom

4    left-hand corner that are handwritten on Exhibit 22

5    mean to you?

6         A.      Those aren't my marks.

7         Q.      Okay.  There is a check symbol, an X,

8    and then some words.  Can you interpret for me, to

9    the best of your abilities, what those marks mean?

10        A.      No, I can't.

11        Q.      Okay.  I'll ask you to set that

12   aside.  Going to hand you what's been marked as

13   Exhibit 23.  Again, for the record, this form is --

14   or this exhibit is dated March 16th, 2000 in the

15   upper left-hand corner.  Dr. Ahmad, again, does

16   this Exhibit 23 appear to be one of the doctor's

17   orders forms that would have been used while you

18   were medical director at the Champaign County Jail?

19        A.      Yes.

20        Q.      And do you recognize the handwriting

21   in the blanks on the middle of the form to be your

22   handwriting?

23        A.      No, it's not my handwriting.

*ADVANTAGE REPORTING SERVICE*
*(309)673-1881;  (800)347-3124*

1        Q.      And did you have a plan for

2    treatment?

3        A.      Yes.

4        Q.      Now, when you say -- and you said

5    this repeatedly throughout the deposition.  You

6    were asked about each of these five visits and you

7    were asked by Counsel for the plaintiff, well did

8    you ever diagnose a cause of his hematuria and I

9    think you told us you did not?

10       A.      Correct.

11       Q.      Why not?

12       A.      Because I referred the patient

13   immediately to urology.  I was under the impression

14   throughout that the patient is being seen by

15   urology.

16       Q.      And then you were asked, did you --

17   repeatedly for each of the times that you saw the

18   patient -- by counsel for the plaintiff, if you

19   ruled out a cause for the hematuria and you said

20   no.  Why not?

21       A.      For the same reason.

22       Q.      Can you explain that answer?

23       A.      For the same reason, because I